**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| MOHAMMAD SADIQ TARER,<br><br>Plaintiff,<br><br>v.<br><br>WARDEN PAIGE JONES ET AL.,<br><br>Defendants. | Civil Action No.: BAH-25-1759 |

# MEMORANDUM OPINION

Self-represented Plaintiff Mohammad Sadiq Tarer, an inmate at Patuxent Institution ("Patuxent") in Jessup, Maryland, filed this civil rights complaint pursuant to 42 U.S.C. § 1983, alleging that Defendants retaliated against him, denied him due process, failed to protect him from harm, and failed to provide adequate medical care in violation of the United States Constitution. ECF 1.

Currently pending are (1) Defendants Solaide Akintade, NP Bernard Alenda, Centurion Health, Jodi Hutchinson, Keith Leuking, Dr. Andrew Moultrie, and CRNP Toyin Olasehinde's (collectively "Centurion Defendants'") motion to dismiss (ECF 18); (2) Governor Wes Moore's motion to dismiss (ECF 34); (3) Correctional Ombudsman Yvonne Briley-Wilson's motion to dismiss (ECF 39); and (4) Defendants Dr. Caron Casciato, Lt. Emmanuel Daburi, Corporal Omar Henson, CO Jason Johnson, Lt. Nicole Johnson, Warden Paige Jones, Major Kennard Judkin, Commissioner J. Phillip Morgan, Sgt. Akinwole Ogboye, Capt. Tikia Olowe, Administrative Officer Ieashia Pressley, and Secretary Carolyn J. Scruggs's (collectively "State Defendants'") motion to dismiss or, alternatively, motion for summary judgment (ECF 42). After the filing of

Defendants' motions, Tarer filed a short motion seeking to amend his complaint (ECF 44).[1] Defendants oppose Tarer's motion to amend. ECFs 45, 46, 48, and 49. Tarer was notified of his right to respond to Defendants' motions (ECFs 20, 35, 40, and 43) but, to date, he has not done so. No hearing is necessary. *See* Loc. R. 105.6 (D. Md. 2025). For the reasons stated below, Defendants' motions are granted and Tarer's motion is denied.

## I. BACKGROUND

### A. Allegations in the Complaint

Tarer states that sometime between October 15 and 20, 2023, he was injured during a flag football game in the recreation yard at Patuxent. ECF 1, at 9. After Tarer was tackled, he lost all mobility in his left arm. When he returned to the sideline after the tackle, he asked Cpl. Henson and CO Johnson to "pop [his] shoulder back in place." *Id.* Johnson escorted Tarer into the gym and told Tarer that Tarer could not tell the medical providers that he was injured during the game because the league would be terminated. *Id.* at 10. Tarer alleges that Johnson told him to say he dropped a dumbbell on his shoulder. *Id.* Tarer did so when he was seen by a nurse about an hour later and she gave him 800 mg of ibuprofen and muscle rub. *Id.* Tarer asked her not to apply the muscle rub because he was in so much pain but the nurse, who purportedly would not give her name, did so anyway and "laugh[ed] and mock[ed]" Tarer when he yelled in pain. *Id.* at 10, 11. Tarer complains that there was no documentation of his injury and he was not sent to be evaluated at a hospital. *Id.* at 11.

In November, Tarer had an appointment with Toyin Olasehinde, who scheduled him for an x-ray. *Id.* at 11. The x-ray, which was completed on December 5, 2023, did not reveal any fractures and Olasehinde advised Tarer that his shoulder would heal on its own. *Id.* at 11–12.

[1] The Clerk shall amend the docket to reflect Defendants' full and correct names and titles.

According to Tarer, the x-ray actually showed an A/C separation, which he discovered later in January 2024 through review of his medical records. *Id.* at 12. Months later, Tarer advised Warden Paige Jones about his injury and the lack of medical care he had received thus far. *Id.* Jones noted Tarer's ID number and told Tarer that "he was going to take care of it," but Tarer alleges nothing happened. *Id.*

Between April and July 2024, Tarer states that several consultations were ordered and he was sent to Jessup Correctional Institution for x-rays. Ultimately, Tarer only saw an orthopedist once, who told him that his injury could heal without surgical intervention and instructed him to do rehabilitation exercises. *Id.* Tarer complains that the orthopedist did not identify the type of injury Tarer had suffered and notes that he also saw Solaide Akintade that same day. *Id.* Two consultations were denied in July because "not enough information [was] provided" despite Tarer stating that his A/C separation was clear. *Id.* at 13.

Tarer saw Medical Director Dr. Moultrie in July or August; he diagnosed Tarer with an elevated clavicle, which purportedly did not require surgical repair. *Id.* Later in August, Tarer was seen by NP Alenda who reviewed his file and found that a referral written by Dr. Moultrie had never been sent. *Id.* at 14. NP Alenda promised to submit a new referral noting that Tarer had an A/C separation. *Id.*

Separately, in August 2024, Tarer wrote a letter to Caron Casciato requesting transfer to a different cell because he and his cellmate were not getting along. ECF 1, at 13. Casciato responded that this was not a valid reason to be moved and denied the request. *Id.* On September 26, 2024, he was in two physical altercations with his cellmate. *Id.*

In October 2024, while in "lock-up segregation," Tarer filed a grievance of undisclosed content. *Id.* at 14 (noting the filing of ARP-PATX-302-24). On or about October 10, 2024, Jodi

Hutchinson asked Tarer if he was "ready to withdraw" his grievance; Tarer declined. *Id.* On October 20 and 21, Tarer asked Lt. Daburi and Lt. Leach, respectively, to take pictures of his injury but Tarer alleges that neither of them did so. *Id.* Tarer made the same request of Sgt. Ogboye on October 30 while Ogboye was on the tier to photograph another incident. *Id.* at 15. Tarer alleges that Ogboye said he would have someone else do it but no one ever never did. *Id.* Assistant Warden Stewart dismissed Tarer's grievance on October 31 and Tarer appealed. *Id.* That same day, Tarer made another request for photographs to Lt. Johnson. *Id.* Though she promised to do so, Tarer says it was never done. *Id.* On November 12, 2024, Tarer met with Sgt. Shields and Major Judkin in the ARP Coordinator Office about two of his pending grievances, which he decided to withdraw. *Id.* at 15–16. Tarer again requested photographs but the request was denied, allegedly because the injury was not recent and had not occurred when Shields and Judkin were working. *Id.* at 16. When Tarer pointed out that Judkin surely had the power as a major to take pictures, Judkin responded that he was not going to help Tarer to "build a lawsuit" or risk his job by assisting Tarer. *Id.*

NP Alenda informed Tarer on November 6, 2024, that his consultation request had been approved and acknowledged that it had taken too long. *Id.* NP Alenda informed Jodi Hutchinson of the consultation to ensure that transportation was arranged for Tarer to see the orthopedic specialist. *Id.* On November 16, 2024, Tarer's mother sent Governor Moore a letter explaining Tarer's difficulties in obtaining medical care which never received a response. *Id.* at 17. Finally, on December 6, 2024, Tarer saw Dr. Ashok Krishnaswamy who advised that Tarer needed surgery and told Tarer that he would request that Patuxent schedule Tarer for an MRI. *Id.*

Shortly thereafter, Tarer was called by Hutchinson to discuss a grievance submitted about a failure to release his medical records to his mother. *Id.* at 17. Tarer provided all of his mother's

contact information. *Id.* On December 19, 2024, Tarer was called to the front desk by Captain Olowe in response to a call from Tarer's public defender asking that his injuries be attended to. *Id.* Photographs were taken and Tarer completed two inmate statements, but Tarer asserts that Olowe failed to sign either statement even after Tarer asked for a copy. *Id.* Commissioner Morgan responded to one of Tarer's appeals on December 23, 2024, but Tarer does not note the outcome in his complaint. *Id.* at 17–18.

Tarer received an MRI at UMBC on February 17, 2025. *Id.* at 18. Tarer returned for a follow-up appointment with Dr. Krishnaswamy on March 25, 2025. *Id.* at 19. After reviewing the MRI results, Dr. Krishnaswamy explained the surgical procedure required for Tarer's injury. *Id.* Tarer did not want him to do the surgery because Dr. Krishnaswamy was affiliated with the state and Tarer "feared retaliation." *Id.* According to Tarer, Patuxent had marked his mother's phone number "as spam" after her numerous inquiries. *Id.* at 18. Dr. Krishnaswamy assured Tarer that he did not have a contract with the state but the complaint appears to reflect that Tarer did not agree to the surgery. *Id.* at 19. As of May 29, 2025, Tarer states he was still in pain and only receiving medical attention when his mother called to complain. *Id.*

Tarer seeks immediate release from incarceration and $100,000,000 in compensatory and punitive damages.[2] ECF 1, at 10.

**B. Centurion Defendants' Response**

Centurion Defendants submit a declaration from Dr. Moultrie along with Tarer's certified medical records. ECFs 18-3 and 18-4. Dr. Moultrie attests that Tarer has a history of significant

[2] Release is not an available form of relief in a § 1983 suit. If Tarer believes that his incarceration is unconstitutional or in violation of federal law, he may seek relief through a habeas corpus petition, but must exhaust any such claim in the state courts prior to filing it in this Court.

left shoulder pain and an acromioclavicular ("AC") separation. ECF 18-4, at 1 ¶ 4. Tarer was seen on October 20, 2023, by NP Alenda for a shoulder contusion with mild swelling that reportedly resulted from a weight lifting incident. *Id.* at 2 ¶ 5; ECF 18-3, at 260–62.[3] He was given ibuprofen, muscle rub, and a warm compress and was also ordered to "stay off" his shoulder for two weeks. *Id.* Tarer returned on December 5, 2023, complaining of ongoing pain to NP Olasehinde and an x-ray revealed "mild widening of the acromioclavicular articulation consistent with acromioclavicular separation of the left shoulder, also known as a shoulder dislocation." ECF 18-4 at 2 ¶ 5; ECF 18-3, at 226, 247–48. Tarer's existing pain management regimen continued and he was instructed to do various exercises until his next appointment in six weeks. ECF 18-4, at 2 ¶ 5. Olasehinde entered a consultation request for the on-site orthopedist on January 11, 2024. ECF 18-3, at 224–25.

On May 23, 2024, Tarer was evaluated by an orthopedist, who diagnosed him with a type 3 shoulder dislocation. ECF 18-4, at 2 ¶ 6; ECF 18-3, at 208. X-ray imaging was repeated, showing "borderline widening of the AC joint and loose bodies in [the] joint space." ECF 18-4, at 2 ¶ 6. On July 10, 2024, because the injury was healing poorly, NP Alenda determined further orthopedic evaluation was necessary and requested another consultation. *Id.* ¶ 7; ECF 18-3, at 187–90, 193–95. Additional imaging and orthopedic consultations were placed and approved in October 2024. ECF 18-4, at 2 ¶ 7; *see* ECF 18-3, at 145–48. Tarer reported to NP Alenda on November 11, 2024, that his shoulder was still in pain and he was provided additional exercises and notified that his orthopedic consultation had been approved. ECF 18-4, at 2 ¶ 8; ECF 18-3, at 122, 127–29. Tarer was eventually seen by an orthopedist on December 6, 2024, who

[3] Citations refer to the pagination assigned by the Court's Case Management and Electronic Case File (CM/ECF) system.

recommended an MRI due to weakness in his rotator cuff as well as outpatient reconstruction of Tarer's ligaments. ECF 18-4, at 2 ¶ 8; *see* ECF 18-3, at 113–14, 116.

On December 16, 2024, orders were approved for an orthopedics follow up appointment, an MRI, and "reconstruction of the left AC joint ligaments with K-wire fixation." ECF 18-4, at 3 ¶ 9; ECF 18-3 at 115. Sometime between February 4 and 28, 2025, Tarer was sent to an outside hospital for an MRI. ECF 18-4, at 3 ¶ 9. Surgical intervention was not recommended by the orthopedist following the MRI, but Dr. Moultrie noted that Tarer's pain medications had not been effective and prescribed Tarer a topical gel. *Id.* ¶ 12; ECF 18-3, at 92. Tarer requested a second opinion about surgical intervention for the dislocation because he had concerns about the orthopedic surgeon, Dr. Krishnaswamy; his request was approved. ECF 18-4, at 3–4 ¶¶ 9, 10, 13; ECF 18-3, at 72, 85, 88. Tarer reported to Dr. Moultrie on April 3, 2025, informing Dr. Moultrie that the topical gel was also ineffective to treat his shoulder pain. ECF 18-3, at 72. It appears that Tarer was not provided alternative relief until July 25, 2025, when he returned from Johns Hopkins Hospital (JHH) after seeing an orthopedic specialist who recommended gabapentin at which point Dr. Kashaun Temesgen approved him for Neurontin and Mobic. *Id.* at 25, 28, 31. During the visit Tarer was referred to Dr. Mohit Gilotra at the University of Maryland, who manages A/C shoulder separations. *Id.* at 23.

**C. State Defendants' Response**

State Defendants submit only Dr. Caro Casciato's "Response to Informal Inmate Complaint." ECF 42-2. The response notes that in requesting to be housed with an inmate in a different program, Tarer "did not specify a safety concern." *Id.* at 2. Casciato discussed the request with a treatment team but due to the lack of safety concerns and the inability to arrange alternative

housing for their respective cellmates, Tarer's request was denied. *Id.* No further concerns were communicated to Casciato from Tarer after her response on August 13, 2024. *Id.*

**D. Motion to Amend Complaint**

Following Defendants' responses to the complaint, Tarer moved for leave to amend the complaint pursuant to Fed. R. Civ. P. 15 on June 4, 2026. ECF 44. Tarer seeks to name the following additional defendants (the Court spells their names as best as could be discerned from the motion): Khadijat Adebayi, Erin Schaffer, Major Tiffanie Carter, Aniya Lewis, Shelton McKenzie, Samantha Klunk-Nduura, Jane Stuthmann, Mayowa Ogundiyun, Andrea Lingston, Emilia Braxton, and Michael Kwitkoski. *Id.* at 1. He also seeks to amend the date of his injury to September 29, 2023, and to add claims for unconstitutional policy or practice, failure to intervene, and abuse of process. *Id.*

Pursuant to Federal Rule of Civil Procedure 15(a), "[a] party may amend its pleading once as a matter of course no later than [] 21 days after serving it, or [] if the pleading is one to which a responsive pleading is required, 21 days after service of a responsive pleading or 21 days after service of a motion under Rule 12(b), (e), or (f), whichever is earlier." Fed. R. Civ. P. 15(a)(1). "In all other cases, a party may amend its pleading only with the opposing party's written consent or the court's leave." Fed. R. Civ. P. 15(a)(2). Rule 15 dictates that "[t]he court should freely give leave when justice so requires." *Id.* Where the proposed amendment to the complaint appears to be futile, this Court has the discretion to deny leave to amend. Futility is apparent if the proposed amended complaint fails to state a claim under the applicable rules and accompanying standards: "[A] district court may deny leave if amending the complaint would be futile—that is, if the proposed amended complaint fails to satisfy the requirements of the federal rules."

*Katyle v. Penn Nat. Gaming, Inc.*, 637 F.3d 462, 471 (4th Cir. 2011) (citing *U.S. ex rel. Wilson v. Kellogg Brown & Root, Inc.*, 525 F.3d 370, 376 (4th Cir. 2008)).

Based on the contents of his motion, it would be futile to allow Tarer to amend his complaint. Tarer provides only names and the labels of claims he seeks to add but fails to include any facts suggesting how, if at all, the new defendants relate to these new claims or how any of the proposed amendments relate to the issues originally raised in the initial complaint. Furthermore, the Court is not inclined to permit such an amendment where Tarer has failed to respond to any of the pending dispositive motions and did not move to amend until almost four months after the last motion was filed. Accordingly, the motion to amend the complaint is denied.

## II. LEGAL STANDARDS

Defendants Moore and Briley-Wilson seek dismissal of the complaint for failure to state a claim. ECFs 34 and 39. To defeat a motion to dismiss under Rule 12(b)(6), the complaint must allege enough facts to state a plausible claim for relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A claim is plausible when the facts pleaded allow "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* Legal conclusions or conclusory statements do not suffice. *Id.* A court must examine the complaint as a whole, consider the factual allegations in the complaint as true, and construe the factual allegations in the light most favorable to the plaintiff. *Albright v. Oliver*, 510 U.S. 266, 268 (1994); *Lambeth v. Bd. Of Comm'rs Of Davidson Cnty., NC*, 407 F.3d 266, 268 (4th Cir. 2005). A self-represented party's complaint must be construed liberally. *Erickson v. Pardus*, 551 U.S. 89, 94 (2007). However, "liberal construction does not mean overlooking the pleading requirements under the Federal Rules of Civil Procedure." *Bing v. Brivo Sys., LLC*, 959 F.3d 605, 618 (4th Cir. 2020).

The Centurion and State Defendants argue that the complaint should be dismissed pursuant to Fed. R. Civ. P. 12(b)(6), or, alternatively, that summary judgment should be granted in their favor pursuant to Fed. R. Civ. P. 56. *See* ECFs 18 and 42. A motion to dismiss styled in the alternative as a motion for summary judgment implicates the Court's discretion under Rule 12(d) of the Federal Rules of Civil Procedure. *See Kensington Vol. Fire Dept., Inc. v. Montgomery Cnty.*, 788 F. Supp. 2d 431, 436–37 (D. Md. 2011), *aff'd* 684 F.3d 462 (4th Cir. 2012). Conversion of a motion to dismiss to one for summary judgment under Rule 12(d) is permissible where a plaintiff has notice that the motion may be disposed of as one for summary judgment. *See Laughlin v. Metro. Washington Airports Auth.*, 149 F.3d 253, 260–61 (4th Cir. 1998). When a movant expressly captions its motion to dismiss "in the alternative" as one for summary judgment and submits matters outside the pleadings for the Court's consideration, the parties are deemed to be on notice that conversion under Rule 12(d) may occur as the Court "does not have an obligation to notify parties of the obvious." *Laughlin*, 149 F.3d at 261; *see also Willey v. Bd. of Educ. of St. Mary's Cnty.*, 557 F. Supp. 3d 645, 657 (D. Md. 2021) ("Notably, 'the Federal Rules do not prescribe that any particular notice be given before a Rule 12 motion is converted to a Rule 56 motion.'" (quoting *Ridgell v. Astrue*, Civ. No. DKC 10-3280, 2012 WL 707008, at *7 (D. Md. Mar. 2, 2012))).

Because the State and Centurion Defendants filed their motions as motions to dismiss or, in the alternative, for summary judgment, Tarer was on notice that the Court could treat the motions as ones for summary judgment and rule on that basis. Accordingly, the Court will consider the exhibits filed in support of the State and Centurion Defendants' motions and review his claims under the Rule 56(a) standard where appropriate.

Rule 56 provides that summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A dispute is genuine if 'a reasonable jury could return a verdict for the nonmoving party.'" *Libertarian Party of Virginia v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013) (quoting *Dulaney v. Packaging Corp. of Am.*, 673 F.3d 323, 330 (4th Cir. 2012)). "A fact is material if it 'might affect the outcome of the suit under the governing law.'" *Id.* (quoting *Henry v. Purnell*, 652 F.3d 524, 548 (4th Cir. 2011)). Accordingly, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment …" *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986) (emphasis in original). "[I]n ruling on a motion for summary judgment, '[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor.'" *Tolan v. Cotton*, 572 U.S. 650, 651 (2014) (per curiam) (quoting *Anderson*, 477 U.S. at 255) (second alteration in original). At the same time, the Court must "prevent factually unsupported claims and defenses from proceeding to trial." *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 526 (4th Cir. 2003) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778–79 (4th Cir. 1993)).

The Court is mindful that Tarer is a self-represented litigant. A federal court must liberally construe pleadings filed by pro se litigants to allow them to fully develop potentially meritorious cases. *See Erickson*, 551 U.S. at 94. But liberal construction does not mean that a court can "ignore an obvious failure to allege facts setting forth a plausible claim for relief." *Sheehan v. Saoud*, 650 F. App'x 143, 152 (4th Cir. 2016) (citing *Weller v. Dep't of Soc. Servs. for City of Baltimore*, 901 F.2d 387, 391 (4th Cir. 1990)). A court cannot assume the existence of a genuine issue of material fact where none exists. Fed. R. Civ. P. 56(c).

## III. DISCUSSION

### A. Defendants Moore and Briley-Wilson's Motions to Dismiss

Defendants Moore and Briley-Wilson seek dismissal of the complaint because Tarer has failed to state plausible claims of relief against them. ECF 34, 39. The Court agrees. Tarer fails to allege either Defendants' participation in a constitutional violation and both are immune from suit in their official capacities.

Liability under § 1983 attaches only upon personal participation by a defendant in the constitutional violation. *Trulock v. Freeh*, 275 F.3d 391, 402 (4th Cir. 2001). It is well established that the doctrine of respondeat superior does not apply in § 1983 claims. *See Love-Lane v. Martin*, 355 F.3d 766, 782 (4th Cir. 2004) (no respondeat superior liability under § 1983). Liability of supervisory officials "is not based on ordinary principles of respondeat superior, but rather is premised on 'a recognition that supervisory indifference or tacit authorization of subordinates' misconduct may be a causative factor in the constitutional injuries they inflict on those committed to their care.'" *Baynard v. Malone*, 268 F.3d 228, 235 (4th Cir. 2001) (quoting *Slakan v. Porter*, 737 F.2d 368, 372 (4th Cir. 1984)). Supervisory liability under § 1983 must be supported with evidence that: (1) the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to citizens like the plaintiff; (2) the supervisor's response to the knowledge was so inadequate as to show deliberate indifference to or tacit authorization of the alleged offensive practices; and (3) there was an affirmative causal link between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff. *See Shaw v. Stroud*, 13 F.3d 791, 799 (4th Cir. 1994).

Nothing in the record establishes that Moore or Briley-Wilson was personally involved in delaying or denying Tarer medical care. Tarer states only that his mother sent Moore a letter about

the situation which did not receive a response, and there is no mention of or allegations against Briley-Wilson in Tarer's complaint. Nothing before the Court plausibly shows the involvement of Moore or Briley-Wilson in the alleged constitutional violations or that they were aware of any subordinate's misconduct. As such, Tarer cannot demonstrate their personal or supervisory liability.

Under the Eleventh Amendment to the United States Constitution, a state, its agencies, and departments are immune from citizen suits in federal court absent state consent or Congressional action. *See Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 100 (1984). Claims against state employees acting in their official capacities are also subject to Eleventh Amendment immunity because a suit against the state actor is tantamount to a suit against the state itself. *Brandon v. Holt*, 469 U.S. 464, 471–72 (1985). The State of Maryland has not waived such immunity for claims brought pursuant to § 1983. Accordingly, Governor Moore and Ombudsman Briley-Wilson are immune from suit for actions taken in their official capacities and those claims must be dismissed. Defendants' motions to dismiss will be granted.

**B. State Defendants' Motion**

The State Defendants seek dismissal of the complaint or summary judgment in their favor because (1) the Eleventh Amendment bars suit against them in their official capacities; (2) Tarer fails to meet the pleading requirements; (3) Tarer fails to state an Eighth Amendment claim for deliberate indifference;[4] (4) Tarer's failure-to-protect claim against Casciato fails as a matter of law; (5) Tarer fails to state a First Amendment claim for retaliation or a Fourteenth Amendment claim for denial of due process; (6) any supervisory liability claim fails; (7) Tarer's state law claims

[4] The Court does not construe any of Tarer's allegations regarding the denial of medical care to be claims against the State Defendants and therefore the Court will not address this argument.

are barred; and (8) the State Defendants are entitled to qualified immunity. ECF 42-1. For the same reasons discussed in the previous section, any claims against the State Defendants in their official capacities must be dismissed. *See Brandon*, 469 U.S. at 471–72. Additionally, because the complaint is devoid of any allegations against Secretary Scruggs or Officer Pressley, they are entitled to dismissal of the complaint. *Trulock*, 275 F.3d at 402.

1. Eighth Amendment Failure to Protect

The Eighth Amendment to the United States Constitution protects prison inmates from "cruel and unusual punishments." U.S. Const. amend. VIII. Though an Eighth Amendment claim could arise from a failure to protect an inmate from an assault by another inmate, "not every injury suffered by a prisoner at the hands of another translates into constitutional liability for prison officials responsible for the victim's safety." *Makdessi v. Fields*, 789 F.3d 126, 133 (4th Cir. 2015). A two-part inquiry that includes both an objective and a subjective component must be satisfied before liability is established. *See Raynor v. Pugh*, 817 F.3d 123, 127 (4th Cir. 2016).

Objectively, the prisoner "must establish a serious deprivation of his rights in the form of a serious or significant physical or emotional injury" or a substantial risk of such an injury. *Id.* (quoting *Danser v. Stansberry*, 772 F.3d 340, 346–47 (4th Cir. 2014)). Subjectively, the prisoner must establish that the prison officials exhibited deliberate or callous indifference to a specific known risk of harm. *See Pressly v. Hutto*, 816 F.2d 977, 979 (4th Cir. 1987). Such deliberate indifference exists if there was a substantial risk of serious harm that was "longstanding, pervasive, well-documented or, expressly noted by prison officials in the past," and the prison official in question had been exposed to that information but did not reasonably respond to it. *Cox v. Quinn*, 828 F.3d 227, 236 (4th Cir. 2016). Deliberate indifference also exists when prison officials were "aware that the plaintiff inmate face[d] a serious danger to his safety and they could avert the

danger easily yet they fail[ed] to do so." *Id.* Where prison officials respond reasonably to the risk, they are not liable even if the harm was not ultimately averted. *Farmer v. Brennan*, 511 U.S. 825, 844 (1994).

Defendant Casciato argues that Tarer's complaint that he was "not getting along" with his cell mate was insufficient to make her aware that there was any actual threat to his safety. ECF 42-1, at 15. The Court agrees. The record does not substantiate that Casciato was deliberately indifferent to a significant risk of harm. The record does not show that Tarer raised any further concerns about his cellmates after his request was denied nor is there anything else in the record showing that Casciato was otherwise aware of a threat to Tarer's safety. As Tarer has failed to establish deliberate indifference, Casciato is entitled to summary judgment in her favor.

2. First Amendment Retaliation

To state a claim of retaliation for exercising a First Amendment right, a plaintiff must allege that: (1) the plaintiff engaged in protected First Amendment activity; (2) the defendant took some action that adversely affected their First Amendment rights; and (3) there was a causal relationship between the protected activity and the defendant's conduct. *See Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 499 (4th Cir. 2005); *cf. Laurent-Workman v. Wormuth*, 54 F.4th 201, 212 (4th Cir. 2022) (outlining elements of a Title VII retaliation claim).

In the prison context, courts "treat [claims of retaliation] with skepticism because 'every act of discipline by prison officials is by definition 'retaliatory' in the sense that it responds directly to prisoner misconduct.'" *Cochran v. Morris*, 73 F.3d 1310, 1317 (4th Cir. 1996) (citing *Adams v. Rice*, 40 F.3d 72, 74 (4th Cir. 1994)). As such, an inmate cannot simply assert a generalized retaliatory animus but must allege facts that support the claim of retaliation. *White v. White*, 886 F.2d 721, 724 (4th Cir. 1989). In *Booker v. v. S.C. Dep't of Corr.*, 855 F.3d 533, 546 (4th Cir.

2017), however, the Fourth Circuit specifically held that it is clearly established that "retaliating against an inmate who filed a prison grievance [is] unlawful." Here, while Tarer references various grievances in his complaint which would constitute protected conduct, he does not allege that any adverse action was taken against him in response to those filings. This stands in contrast to *Booker*, where the inmate alleged that shortly after filing a grievance about a supervisor, that supervisor recommended that the inmate be charged with a severe disciplinary infraction. *See id.* at 536. Tarer speculates that retaliation against him may come in the form of interference with his shoulder surgery, but this is unsupported and he does not allege that he has suffered from any actual adverse action. Regardless, the complaint does not reveal any causal relationship between any adversity and the filing of prison grievances. As such, this claim must be dismissed.

3. Due Process

Throughout the complaint, Tarer makes various allegations that improper decisions were made concerning his cell assignment, documentation of his injury, and handling of his institutional grievances. To the extent Tarer asserts that any of these decisions violate prison policy, that alone is not sufficient to state a Fourteenth Amendment due process claim. *See Myers v. Klevenhagen*, 97 F.3d 91, 94 (5th Cir. 1996); *Kitchen v. Ickes*, 116 F. Supp. 3d 613, 629 & n.6 (D. Md. 2015) (citing *Myers*, 97 F.3d 91). "[G]iven a valid conviction, the criminal defendant has been constitutionally deprived of his liberty to the extent that the State may confine him and subject him to the rules of its prison system so long as the conditions of confinement do not otherwise violate the Constitution." *Meachum v. Fano*, 427 U.S. 215, 224 (1976); *see also Sandin v. Conner*, 515 U.S. 472, 493 (1995) (requiring an atypical and significant hardship as prerequisite to creation of a constitutionally protected liberty interest). A liberty interest is created by the imposition of an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life."

*Sandin*, 515 U.S. at 484. Specifically as to a prisoner's use of the institutional grievance procedure, "the Constitution creates no entitlement to grievance procedures or access to any such procedure." *Booker*, 855 F.3d at 541 (quoting *Adams v. Rice*, 40 F.3d 72, 75 (4th Cir. 1994)). Once the grievance process is accessed, however, a prisoner is protected from retaliation under the First Amendment. *See id.* at 540. However, as discussed above, Tarer has not sufficiently plead such a claim.

Here, beyond asserting that his various requests were denied, Tarer fails to plead any facts suggesting that those denials created an atypical or significant hardship. He does not provide factual allegations supporting the conclusion that he has a constitutionally protected interest in acquiring photographic documentation of his injuries. Nor has he included any facts showing that his cell assignment posed an unreasonable risk of harm to his safety that any defendant ignored. Rather, it appears Tarer merely disagrees with the decisions to deny his requests. This is insufficient to state a plausible claim for violation of his due process rights and therefore his due process claims must be dismissed.

4. Supervisory Liability

To the extent Tarer seeks to hold Warden Jones, Commissioner Morgan, Maj. Judkin, Lt. Daburi, Lt. Johnson, or Sgt. Ogboye liable in their supervisory capacities, these claims also fail. As discussed, § 1983 generally does not impose liability on supervisors for the wrongdoing of their employees. *See Love-Lane*, 355 F.3d at 782 (no respondeat superior liability under § 1983). Rather, a supervisor may be liable for the violations of their subordinates if the supervisor knew the subordinates engaged in conduct that posed an unreasonable risk of constitutional injury and failed to respond in such a manner that gives to an inference of deliberate indifference or tacit authorization of their subordinates' bad acts. *See Shaw*, 13 F.3d at 799. As no underlying

constitutional violations exist based on Tarer's allegations, supervisory liability cannot extend to any of these defendants. *See Hinkle v. City of Clarksburg, W.Va.*, 81 F.3d 416, 420–21 (4th Cir. 1996). Therefore, the State Defendants' motion will be granted.

**C. Centurion Defendants' Motion**

The Centurion Defendants seek dismissal of the complaint or summary judgment in their favor because (1) Tarer's complaint fails to state a cause of action under § 1983, (2) they are entitled to qualified immunity, and, alternatively, (3) they are entitled to summary judgment on the undisputed material facts. ECF 18-2. Again, as a preliminary matter, because there are no allegations of wrongdoing by Defendants Akintade, Leuking, Hutchinson, or Centurion Health, the complaint will be dismissed against them. At most, Tarer states that he saw Akintade on one occasion and that he discussed various grievances with Hutchinson. Neither allegation suggests wrongdoing or participation in a constitutional violation as no specific allegations are made against either Leuking or Centurion Health.

The Eighth Amendment prohibits "unnecessary and wanton infliction of pain" by virtue of its guarantee against cruel and unusual punishment. *Gregg v. Georgia*, 428 U.S. 153, 173 (1976); *see also Hope v. Pelzer*, 536 U.S. 730, 737 (2002); *Scinto v. Stansberry*, 841 F.3d 219, 225 (4th Cir. 2016); *King v. Rubenstein*, 825 F.3d 206, 218 (4th Cir. 2016). "Scrutiny under the Eighth Amendment is not limited to those punishments authorized by statute and imposed by a criminal judgment." *De'Lonta v. Angelone*, 330 F.3d 630, 633 (4th Cir. 2003) (citing *Wilson v. Seiter*, 501 U.S. 294, 297 (1991)); *accord Anderson v. Kingsley*, 877 F.3d 539, 543 (4th Cir. 2017). To state a claim for denial of medical care, a plaintiff must demonstrate that the actions of the defendants, or their failure to act, amounted to deliberate indifference to a serious medical need. *See Estelle v. Gamble*, 429 U.S. 97, 106 (1976); *see also Anderson*, 877 F.3d at 543.

Deliberate indifference to a serious medical need requires proof that, objectively, the prisoner plaintiff was suffering from a serious medical need and that, subjectively, the prison staff were aware of the need for medical attention but failed to either provide it or ensure it was available. *See Farmer*, 511 U.S. at 834–37; *see also Heyer v. United States Bureau of Prisons*, 849 F.3d 202, 209–10 (4th Cir. 2017); *King*, 825 F.3d at 218; *Iko v. Shreve*, 535 F.3d 225, 241 (4th Cir. 2008). Objectively, the medical condition at issue must be serious. *See Hudson v. McMillian*, 503 U.S. 1, 9 (1992) (there is no expectation that prisoners will be provided with unqualified access to health care); *Jackson v. Lightsey*, 775 F.3d 170, 178 (4th Cir. 2014). "A 'serious medical need' is 'one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'" *Heyer*, 849 F.3d at 210 (quoting *Iko*, 535 F.3d at 241); *see also Scinto*, 841 F.3d at 228 (failure to provide diabetic inmate with insulin where physician acknowledged it was required is evidence of objectively serious medical need).

After a serious medical need is established, a successful Eighth Amendment claim requires proof that the defendants were subjectively reckless in treating or failing to treat the serious medical condition. *See Farmer*, 511 U.S. at 839–40. Under this standard, "the prison official must have both 'subjectively recognized a substantial risk of harm' and 'subjectively recognized that his actions were inappropriate in light of that risk.'" *Anderson*, 877 F.3d at 545 (quoting *Parrish ex rel. Lee v. Cleveland*, 372 F.3d 294, 303 (4th Cir. 2004)); *see also Rich v. Bruce*, 129 F.3d 336, 340 n.2 (4th Cir. 1997) ("True subjective recklessness requires knowledge both of the general risk, and also that the conduct is inappropriate in light of that risk."). "Actual knowledge or awareness on the part of the alleged inflicter . . . becomes essential to proof of deliberate indifference 'because prison officials who lacked knowledge of a risk cannot be said to have inflicted punishment.'"

*Brice v. Virginia Beach Corr. Ctr.*, 58 F.3d 101, 105 (4th Cir. 1995) (quoting *Farmer*, 511 U.S. at 844). The subjective knowledge requirement can be met through direct evidence of actual knowledge or through circumstantial evidence tending to establish such knowledge, including evidence "that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Scinto*, 841 F.3d at 226 (quoting *Farmer*, 511 U.S. at 842).

As a preliminary matter, the Centurion Defendants do not appear to dispute the severity of Tarer's shoulder injury and Tarer's attendant need for medical attention. As such, the Court will address only whether the defendants were deliberately indifferent to that need. The Centurion Defendants assert that there is no evidence that Tarer's injury was ignored nor that any of them acted with deliberate indifference. ECF 18-2, at 8, 15. They also argue that Tarer relies only on his own opinions and conclusions regarding what medical care he should have received. *Id.*

A review of the record construed in the light most favorable to Tarer fails to reflect that he was treated with deliberate indifference by any of the Centurion Defendants. Immediately following his injury, Tarer was evaluated and treated by NP Alenda. Then, in response to Tarer's continued pain and discomfort, Olasehinde ordered an x-ray. As no fracture was indicated, he was prescribed rehabilitative exercises in addition to a pain management regimen. Additionally, the Centurion Defendants ordered various consultations with orthopedists and additional imaging. When Dr. Krishnaswamy ultimately determined that surgical intervention was necessary, Tarer declined due to his concerns about the State's influence on the doctor. Thus, any delay in receiving surgical correction cannot be attributed to indifference by the Centurion Defendants. Rather, Dr. Moultrie agreed to facilitate a second opinion at Tarer's request. He also adjusted Tarer's pain medication twice after Tarer reported ongoing pain.

While Tarer may understandably protest how long this process took, that delay does not rise to the level of deliberate indifference. Moreover, he admits that he lied to NP Alenda, albeit at the alleged suggestion of a correctional officer, about the cause of his injuries. Regardless of whether Tarer lied at the behest of correctional officers or of his own accord, the medical providers at Patuxent can only make judgments based on the information provided. As such, if Tarer's football injury required different or additional evaluation, there is no indication that Alenda or any of the other Centurion Defendants were aware of the actual nature of his injury because they were told that it was caused by a falling dumbbell. Moreover, despite this misinformation, Alenda and Olasehinde requested additional imaging and orthopedic consultations when Tarer's shoulder dislocation based on their own evaluations and in response to outside orthopedists' recommendations. As such, nothing in the record shows that the remaining Centurion Defendants were deliberately indifferent to Tarer's medical needs and summary judgment is appropriate as to those claims.

**D. Remaining Claims and Arguments**

"[W]hen the federal-law claims have dropped out of the lawsuit in its early stages and only state-law claims remain, the federal court should decline the exercise of jurisdiction by dismissing the case without prejudice." *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988) (citing *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726–727 (1966)). Tarer's negligence, medical negligence, and intentional infliction of emotional distress claims will be dismissed without prejudice. Additionally, as the State and Centurion Defendants' motions have been granted for the above-stated reasons, the Court need not address their qualified immunity arguments.

## IV. CONCLUSION

By separate order to follow, Defendants' motions are GRANTED and Tarer's motion to amend the complaint is DENIED. Summary judgment will be entered in favor of Defendants Alenda, Moultrie, Olasehinde, and Casciato in her individual capacity. All other federal claims will be DISMISSED and any state law claims will be DISMISSED without prejudice.

A separate Order follows.

August 18, 2026
Date

/s/
Brendan A. Hurson
United States District Judge